IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Sonoco Products Company, | C.A. No. 4:12-cv-00790-BHH |
| Plaintiff, | |
| vs. | **OPINION AND ORDER** |
| Levent Güven, | |
| Defendant. | |

Plaintiff, Sonoco Products Company ("Sonoco"), filed this action against Defendant, Levent Güven ("Güven"), alleging claims for breach of contract, breach of duty of loyalty, and misappropriation of trade secrets. On October 28, 2014, this Court entered an order striking Güven's Answer and entering a default judgment in favor of Sonoco pursuant to Federal Rule of Civil Procedure Rule 37(b)(2)(A) based on Güven's willful failure to obey the Court's discovery orders dated June 18, 2014 and August 19, 2014 (ECF No. 124) (the "Sanctions Order'). A hearing was held on December 17, 2014 for the purpose of determining Sonoco's damages (the "Damages Hearing"). After carefully reviewing and considering the evidence presented at the Damages Hearing, for the reasons set forth below, the Court finds that judgment shall be entered against Güven in the amounts set forth below.

## I.    REPRESENTATION OF AND NOTICE TO GÜVEN.

From the date Güven was initially served with the summons and complaint and brought into this matter, Güven was vigorously represented by qualified and able counsel in all proceedings in this lawsuit, including Sonoco's motion for sanctions, up until October 28, 2014, when the Court issued an order granting the motion to withdraw as counsel filed by Güven's counsel of record (ECF No. 124 at 18). Güven expressly consented to his counsel's motion to withdraw as counsel as evidenced by his signed

consent (ECF No. 98-2). [1]   Güven's counsel briefed and opposed the motion for sanctions on behalf of Güven and also attended the hearing on Sonoco's motion for sanctions, where counsel for Güven argued on behalf of Güven against the sanctions sought by Sonoco.   Güven's counsel also opposed Sonoco's underlying motion to compel discovery through briefs and arguments at the hearing on the motion to compel, and even sought reconsideration of the order compelling Güven to produce the discovery that ultimately led to the motion for sanctions (ECF No. 86).   The Court allowed Güven's counsel to withdraw as counsel only after the Court had already decided to grant Sonoco's motion for sanctions.   *See* Transcript of Motion Hearing, Oct. 20, 2014, at pp. 13-15 (sanctions motion heard and ruled on before Court took up counsel's renewed motion to withdraw); ECF No. 124 at 18 (the permission for Güven's counsel to withdraw as counsel contained at end of Sanctions Order).

The Sanctions Order required Sonoco to serve Güven with copies of the Sanctions Order and Sonoco's attorney's fees affidavit (ECF No. 122) by mailing these documents to the address set forth in the Sanctions Order ("Güven's Service Address") (ECF No. 124 at 18).   Güven's Service Address was provided to the Court by Güven, represented by Güven to be his address for service of papers, and represented by Güven to be the address where any service in this case would be received and accepted by him.   The Certificate of Service of H. Sam Mabry, III (ECF No. 130) establishes that Sonoco mailed these documents to Güven's Service Address.   The Court finds that Sonoco has complied with the service requirements set forth in the Sanctions Order.

By Text Order dated October 30, 2014, this Court scheduled the Damages

---

[1] Güven also had the right to obtain substitute counsel after October 28, 2014, which he did not do.

Hearing in this matter for December 17, 2014 (ECF No. 128). The Certificate of Service of H. Sam Mabry, III (ECF No. 130) establishes that Sonoco served Güven with a copy of this Text Order on November 4, 2014, by mailing a copy of the Order to Güven's Service Address (ECF No. 124 at 18). Although not required to do so, Sonoco also served Güven with a Notice of Damages Hearing which accurately and specifically set forth the time, place, location and purpose of the Damages Hearing (Sonoco Damages Hearing Exhibit 1). The written Notice advised Güven of his and/or his counsel's right to appear at the Damages Hearing and participate as permitted by law. The Court finds that service of this notice was valid and sufficient under United States law. *See* Fed. R. Civ. P. 5(b)(2)(C) (stating that a paper filed after the summons and complaint may be served by "mailing it to the person's last known address"); Local Rule 83.I.07, DSC (requiring counsel seeking withdrawal as counsel to provide the Court "with a mailing address" for the client); ECF No. 98-1 at n. 1 (listing Güven's address).[2]

In addition to mailing the Notice by United States Mail in accordance with United States law, the Notice of Damages Hearing was translated into Turkish and the translated Notice of Damages Hearing served on Güven in Turkey. Sonoco has submitted to the Court the Declaration of Murat Karkin stating that the translated Notice of Damages Hearing was served on Güven in Turkey on November 25, 2014, in accordance with Turkish law and procedure. (Sonoco Damages Hearing Exhibit 2).

The Court finds Güven was provided with more than sufficient notice of the Damages Hearing to satisfy United States law, including due process under the United States Constitution. Güven did not attend the Damages Hearing, nor did anyone attend on his behalf. However, because Güven was clearly provided with notice and

---

[2] Additionally, the Service Address was shown as Güven's address on the consent to withdraw that Güven signed (ECF No. 98-2).

opportunity to appear and participate at the Damages Hearing, his failure to attend the hearing does not affect in any way the application of this order or the enforceability of a judgment based on this order under United States law.  *See, e.g., Davis v. Hutchins*, 321 F.3d 641, 645-46 (7th Cir. 2003) (rejecting the defendant's argument that a default judgment violated due process where the defendant failed to attend hearings on damages since the defendant "was afforded notice and the opportunity to respond."); *Yusov v. Yusuf*, 892 F.2d 784, 787 (9th Cir. 1989) (affirming default judgment in the sum of $2,035,387.90 against defendants who failed to attend the hearing on the default judgment where the court found the defendants "had proper notice of the hearing"); *see also Fosberry v. Coyle Bus. Prods.*, No. 2:10-cv-00799-RMG-BHH, 2012 U.S. Dist. LEXIS 59616 (D.S.C. April 30, 2012) (entering a default judgment against a party that was served with a notice of the damages hearing but failed to attend).

## II.    EFFECT OF THE DEFAULT JUDGMENT.

When a default is entered against a defendant, the law is clear that the well-pleaded factual allegations in the complaint are deemed admitted and the court is to accept such factual allegations as true.  *DIRECTV, Inc. v. Rawlins*, 523 F.3d 318, 322 n.2 (4th Cir. 2008) (citing *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001)); *Mary Kay Inc. v. Ayres*, 827 F. Supp.2d 584, 589 (D.S.C. 2011); *see also Fosberry v. Coyle Bus. Prods.,* No. 2:10-cv-00799-RMG-BHH, 2012 U.S. Dist. LEXIS 46061 (D.S.C. March 29, 2012) *adopted by, motion granted by, judgment entered by* 2012 U.S. Dist. LEXIS 59616 (D.S.C. April 30, 2012).  The court must then determine whether the well-pleaded factual allegations in the complaint support the relief sought in the action.  *Ryan*, 253 F.3d at 780; *Mary Kay Inc.*, 827 F. Supp.2d at 590.  If liability is established, the court must then determine the appropriate amount of damages.  *Bank*

*of Camden v. Hooker*, No. 8:14-cv-01050-JMC, 2014 U.S. Dist. LEXIS 115017, at **2-3 (D.S.C. Aug. 19, 2014) (citing *Ryan*, 253 F.3d at 780-81).  The Court's analysis will proceed in this manner.

## III.    FINDINGS OF FACT AS TO LIABILITY.

Having found Güven to be in default, the Court accepts Sonoco's well-pleaded factual allegations as true, including the following factual findings that are particularly material to the damages claims:

1.    Güven is a Turkish National who holds a United States Permanent Resident Card (informally known as a Green Card), issued by the United States Government, granting him permanent resident status.

2.    Güven was employed by Sonoco from June 1, 1998, to April 5, 2010, when Sonoco terminated his employment.

3.    Prior to his employment with Sonoco, Güven had no experience or knowledge of the industrial products business.

4.    Through Sonoco's management trainee program, Güven spent time in multiple Sonoco plants, both in the United States and in foreign locations, learning the operations and competitive strategies of the Industrial Products Division of Sonoco.

5.    Güven successfully completed Sonoco's management trainee program, and he thereafter accepted an expatriate assignment to be employed as the Sales and Marketing manager for a Sonoco subsidiary in Bursa, Turkey ("Sonoco Turkey").

6.    Güven was heavily involved in managing Sonoco Turkey's operations, and Sonoco entrusted him with a high level of management autonomy and information.

7.    Güven co-managed Sonoco Turkey with Adem Gürada (Gürada), who was a direct employee of Sonoco Turkey.  Güven served as the Sales and Marketing

Manager for Sonoco Turkey, and Gürada served as the Regional Operations Manager. Güven and Gürada managed all aspects of Sonoco Turkey's operations.

8.    Güven's duties for Sonoco Turkey gave him access to and knowledge of Sonoco's trade secrets and proprietary information, including manufacturing and sales processes, product and sales formulas, manufacturing and sales strategies, pricing formulas and strategies, highly specialized manufacturing devices and equipment, customer lists, source lists, supplier lists, sales contacts, and business relationships (collectively, the "Protected Information").

9.    Sonoco's Protected Information includes trade secrets under the South Carolina Trade Secrets Act, S.C. Code Section 39-8-20(5).    Sonoco has made reasonable efforts to maintain the secrecy of its trade secrets.

10.    Sonoco Turkey's operations are based in large part on Sonoco's Protected Information, so Güven became intimately familiar with the Protected Information while managing Sonoco Turkey.

11.    Prior to beginning work with Sonoco, Güven entered into an Employee Agreement, whereby he promised to protect certain trade secrets and proprietary information of Sonoco.    Through the Employee Agreement, Güven specifically acknowledged and agreed:

>    (a)    that Sonoco "desires to protect its manufacturing know-how, trade secrets, technical developments, and proprietary information regarding its products and markets";

>    (b)    that the Protected Information includes, but is not limited to, "written as well as unwritten technical and business information […], raw material sources, specifications and costs; production equipment

configurations and designs; manufacturing techniques and process parameters; confidential marketing information including strategic plans, product preferences and purchasing frequencies […].  This proprietary information constitutes valuable trade secrets or confidential information […] which are the property of [Sonoco], and I agree not to disclose or use the same other than in the business of [Sonoco]";

(c)    "not to, directly or indirectly, disclose or make available to any third party or use outside of [Sonoco] during or after my employment (including by resignation, termination, or retirement), any proprietary information or trade secrets, including information received by [Sonoco] from third parties under conditions of secrecy, without the prior written consent of an authorized official of [Sonoco]";

(d)    "to safeguard all Confidential information at all times so it is not exposed to, or taken by, unauthorized persons, and when entrusted to me will exercise my best efforts to assure its safe-keeping";

(e)    that he "shall not, for a period of two (2) years following my last day of employment with [Sonoco], enter into any employment relationship wherein my duties would present a material prospect of disclosure or use of Confidential Information belonging to [Sonoco] or which would otherwise violate [Sonoco's] obligations of secrecy owed to a third party.  While the period of this covenant against employment under the circumstances specified in this paragraph shall expire in two (2) years, I acknowledge that my general obligation to refrain from actually using or disclosing proprietary information or trade secrets […] shall continue

7

beyond this term and specifically until the information shall become public through no fault on my part."

12.    In addition to the Employee Agreement, before beginning his employment with Sonoco, Güven received and agreed to the terms of Sonoco's Policies on Business Conduct, which sets forth the high ethical standards that Sonoco requires its employees to observe as a term of employment.    Güven thereafter received annual copies of Sonoco's Policies on Business Conduct throughout the term of his employment with Sonoco.    He regularly acknowledged receipt of the Policies on Business Conduct, and he regularly reaffirmed his promise to abide by them.

13.    The Policies on Business Conduct required Güven, among other things, to conduct business in an ethical manner, to deal fairly and honestly, to disclose conflicts of interest, not to maintain any undisclosed interests in vendors, to protect corporate assets and confidential information, and to use company work time to perform only the business of the company.

14.    While employed with Sonoco, Güven and Gürada secretly formed a company called Konfida Ambalaj Tekstil San. Ve Tic. Ltd. Şti. ("Konfida"), for the purpose of competing directly with Sonoco Turkey, using Sonoco's Protected Information for their own purposes and pecuniary benefit.

15.    Konfida competes directly with Sonoco Turkey, offering identical products to Sonoco's customers, and Konfida manufactures its products using the same formulas, designs, machines, equipment, and supplies as Sonoco Turkey.    In particular, and without limitation, Konfida unlawfully uses Sonoco's Proprietary Information to manufacture and sell bobbins for rolled textile products without compensating Sonoco.

16.     Konfida's manufacturing operations are virtually identical to Sonoco Turkey's in every respect.

17.     The manufacturing equipment used by Sonoco Turkey is custom designed for Sonoco, and is part of its Protected Information.

18.     Similarly, the designs of the manufacturing set-ups, the manufacturing processes, and the manufacturing formulas used by Sonoco Turkey are unique to Sonoco and are part of Sonoco's Protected Information.

19.     After forming Konfida, and while still employed by Sonoco, Güven and Gürada solicited Sonoco Turkey's employees to work for Konfida.

20.     In setting up and operating Konfida, Güven and Gürada used Sonoco's sales formulas, pricing strategies, customer lists, and business relationships to the detriment of Sonoco and for their own personal benefit.

21.     As the sales manager for Sonoco Turkey, Güven had access to these formulas, strategies, lists, and relationships, which are part of Sonoco's Protected Information.

22.     Güven's use of Sonoco's Protected Information for his own competitive purposes has caused irreparable harm to Sonoco.

23.     Güven's continued dissemination and use of Sonoco's Protected Information will have severe impacts to Sonoco's competitive position in the industry, and would unfairly enrich its competitors.

24.     Güven's actions regarding the operations of Konfida have caused and will continue to cause Sonoco irreparable and incalculable harm to Sonoco.

25.     Güven's above-referenced actions were revealed to Sonoco during the early part of 2010.

26.    Prior to leaving Sonoco, Güven and/or Gürada collected tangible information related to Sonoco's customers for Güven to use at Konfida, including product specifications and pricing lists, which are part of Sonoco's Protected Information.

27.    Güven continues to operate Konfida in direct competition with Sonoco Turkey, and he continues to use Sonoco's Protected Information on behalf of Konfida.

28.    Güven continues to actively solicit Sonoco Turkey employees and poach Sonoco's customers, using his access to and knowledge of Sonoco's Protected Information.

29.    Güven has breached the Employee Agreement and Policies on Business Conduct by refusing to take reasonable steps to safeguard Sonoco's Protected Information, by using Sonoco's Protected Information for his own personal benefit and advantage and for the purposes and pecuniary benefit of Konfida, and by secretly forming Konfida for the purpose of competing directly with Sonoco Turkey. Sonoco has suffered damages as a direct and proximate result of these breaches.

30.    Güven has misappropriated Sonoco's trade secrets, as defined in S.C. Code Section 39-8-20(5). As a direct and proximate result of this misappropriation, Sonoco has suffered damages.

31.    Sonoco has willfully disclosed and used Sonoco's Protected Information, evidencing a willful, wanton, or reckless disregard for Sonoco's rights.

32.    Güven was a management level employee of Sonoco and owed a duty of loyalty to Sonoco, including the duty not to do disloyal acts looking to future compensation and the duty not to act adversely to the interest of Sonoco by serving or acquiring any private interest of his own in antagonism or opposition to Sonoco.

33.    Güven breached his duty of loyalty by creating and operating Konfida, by engaging or acquiescing in soliciting and pressuring Sonoco Turkey's employees, by using or acquiescing in the use of Sonoco employees to perform work for Konfida while those employees were being compensated by Sonoco, by soliciting Sonoco's customers and business relationships, by using Sonoco's Protected Information for his own personal benefit and advantage and for the purposes and pecuniary benefit of Konfida, and by all other manners described more fully above.  Sonoco has suffered damages as a direct and proximate result of these breaches.

## IV.    ANALYSIS OF CLAIMS.

Having found the above facts as true, the Court must ensure these facts set forth claims as to which relief can be granted pursuant to the standard of Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See Mary Kay, Inc.*, 827 F.Supp.2d at 590.

### A.    Breach of Contract.

To establish its claim for breach of contract, Sonoco must show the existence of a contract, its breach, and damages caused by the breach.  *See Maro v. Lewis*, 389 S.C. 216, 222, 697 S.E.2d 684, 688 (Ct. App. 2010).  Here, the facts establish that Sonoco and Güven entered into the Employee Agreement and, as an additional part of the terms and conditions of his employment contract with Sonoco, received and agreed to the terms of Sonoco's Policies on Business Conduct.  Further, as set forth above, Güven breached these contracts, and such breach has caused damages to Sonoco.[3]

---

[3] This Court has already held that Güven's contract with Sonoco, which was formed in the United States, is separate and distinct from agreements between Güven and Sonoco Turkey. (ECF No. 52 at 7).  The Court finds that Sonoco has an enforceable contract with Güven regardless of any contract Güven may have with Sonoco Turkey.  In any event, Sonoco is pursuing remedies only under its claims for Misappropriation of Trade Secrets and Breach of the Duty of Loyalty.

### B.    <u>Misappropriation of Trade Secrets.</u>

To establish a claim for misappropriation of trade secrets under the South Carolina Trade Secrets Act, a plaintiff must show: (1) the existence of a trade secret; (2) misappropriation, wrongful use, or wrongful disclosure of a trade secret by the defendant; and (3) damages. *See* S.C. Code Ann. § 39-8-30(C); *see also Secure Energy, Inc. v. Coal Synthetics, LLC*, 708 F. Supp. 2d 923, 926 (E.D. Mo. 2010) (listing these as the elements of a claim under the Missouri Uniform Trade Secrets Act). Here, the findings of fact clearly establish the existence of trade secrets of Sonoco. Sonoco disclosed such trade secrets to Güven only after Güven signed and acknowledged the Employee Agreement, which, among other things, prohibited him from using or disclosing Sonoco's trade secrets. Thereafter, the facts reveal that Güven used and disclosed such trade secrets in breach of those contractual duties. Thus, at the time of Güven's use and disclosure of these trade secrets, Güven clearly knew or had reason to know, by virtue of the Employee Agreement, that his knowledge of Sonoco's trade secrets was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. S.C. Code Ann. § 39-8-20(2) (defining "Misappropriation" to include, among other things, unauthorized "disclosure or use of a trade secret of another without express or implied consent by a person who . . . (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . (B) acquired . . . under circumstances giving rise to a duty to maintain its secrecy or limit its use."). As set forth below, Sonoco has also shown damages that are permitted under Section 39-8-40(B) of the South Carolina Trade Secrets Act. Consequently, the facts adequately state a misappropriation of trade secrets claim.

### C.    Breach of the Duty of Loyalty.

Sonoco's third cause of action is for breach of the duty of loyalty.[4]  To establish such a claim, a plaintiff must show the existence of a duty of loyalty, a breach of that duty by the defendant, and damages proximately resulting from the wrongful conduct of the defendant.  *See RFT Mgmt. Co., L.L.C. v. Tinsley & Adams L.L.P.*, 399 S.C. 322, 335-36, 732 S.E.2d 166, 173 (2012).   An employee owes a duty of loyalty to his employer to remain faithful to the employer's interests throughout the term of employment, to abide by his employer's instructions and policies, and to carry out those instructions and policies.  *Foreign Academic & Cultural Exch. Servs., Inc. v. Tripon*, 394 S.C. 197, 204, 715 S.E.2d 331, 334 (2011); *Nucor Corp. v. Bell*, 482 F. Supp. 2d 714, 727 n. 9 (D.S.C. 2007); *Young v. McKelvey*, 286 S.C. 119, 122, 333 S.E.2d 566, 567 (1985); *Berry v. Goodyear Tire and Rubber Co.*, 270 S.C. 489, 491, 242 S.E.2d 551 (1978); *Lowndes Products, Inc. v. Brower*, 259 S.C. 322, 191 S.E.2d 761 (1972).  The facts establish that, among other things, Güven was an employee of Sonoco and that Sonoco entrusted him with a high level of management autonomy and information. While still employed by Sonoco, Güven formed a competing business using Sonoco's Protected information.   As set forth below, Sonoco has shown damages proximately resulting from this breach.  Sonoco has established a claim for breach of the duty of loyalty.

---

[4] Under its breach of the duty of loyalty claim, Sonoco seeks to recover compensation it paid to Güven during the time period of Güven's disloyalty.  Such damages are separate and distinct from the reasonable royalty that Sonoco seeks to recover under its claim for misappropriation of trade secrets.  Consequently, Sonoco is not required to elect between the remedies for those two claims.  *See, e.g., Homeland Training Center, LLC v. Summit Point Auto. Research Center*, ("The basic purpose of the doctrine [of election of remedies] is to prevent a plaintiff from obtaining a windfall recovery, either by recovering two forms of relief that are premised on legal or factual theories that contradict one another or by recovering overlapping remedies for the same legal injury."); *see also Vendo Co. v. Stoner* 58 Ill.2d 289, 321 N.E.2d 1, 15 (1974) (rejecting the defendants' argument that recovery of the salary paid to the disloyal defendant in addition to recovery of the plaintiff's lost profits constitutes an impermissible double recovery).

Accordingly, the Court finds that the well-pleaded allegations, which Güven is deemed to have admitted, adequately state claims upon which relief may be granted for breach of contract, misappropriation of trade secrets, and breach of the duty of loyalty.

## IV.    DAMAGES.

After a court determines, as it has here, that a judgment by default should be entered, it must determine the amount and character of the recovery that should be awarded to the plaintiff.  *See Hewitt v. Morris*, No. 0:12-666-MGL-PJG, 2012 U.S. Dist. LEXIS 184677, 2012 WL 6864598, at *1 (D.S.C. Dec. 20, 2012) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2688 at 63 (3d ed. 1998)).[5]

### A.    Actual Damages.

#### 1.    Misappropriation of Trade Secrets.

The plaintiff in a trade secrets case may recover actual damages for misappropriation.  *See* S.C. Code Ann. § 39-8-40(A).  A trade secrets plaintiff does not have to show that the defendant used the information in competition with the plaintiff in order to recover damages from the defendant.  *See* S.C. Code Ann. § 39-8-20(2), § 39-8-30(C), §39-8-40.  In *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655 (4th Cir. 1993), the Fourth Circuit rejected the defendant's argument that its acquisition of the trade secret did not constitute misappropriation because it did not use the trade secret to compete against the plaintiff.  *Id.* at 665.  The Fourth Circuit explained that the defendant "ignores the language of the statute.  The [Maryland Uniform Trade Secrets Act] *does not require proof of competition*, but only proof of improper acquisition or

---

[5] The parties do not have the right to a jury trial as to the amount of recovery.  *See Adriana Intern. Corp. v. Thoeren*, 913 F.2d 1406, 1414 (9th Cir. 1990) (stating "after a default judgment has been entered under Fed. R. Civ. P. 37(b)(2), a party has no right to jury trial under either Fed. R. Civ. P. 55(b)(2), which authorizes a district court to hold an evidentiary hearing to determine the amount of damages, or the Seventh Amendment").

improper use." *Id.* (emphasis added).  In so holding, the Fourth Circuit cited to the definition of "misappropriation" in the Maryland Uniform Trade Secrets Act.  *See id.*  The South Carolina Trade Secrets Act definition of misappropriation is identical in all relevant aspects to the definition in the Maryland Uniform Trade Secrets Act. *Compare* Md. Com. Law II Code Ann. § 11-1201(c) *with* S.C. Code Ann. § 39-8-20(2).

A plain reading of the South Carolina Trade Secrets Act confirms that a plaintiff may recover damages using a reasonable royalty theory even if the defendant is not using the plaintiff's trade secrets in direct competition with the plaintiff.  *Resolution Trust Corp. v. Eagle Lake and Golf Condominiums*, 310 S.C. 473, 476, 427 S.E.2d 646, 648 (1993) ("Words used in a statute should be given their plain and ordinary meaning."); *McClanahan v. Richland County Council*, 350 S.C. 433, 438, 567 S.E.2d 240, 242 (2002) ("language must be construed in light of the intended purpose of the statute."); *BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F.3d 1332, 1339 (Fed. Cir. 2002) ("The 1997 enactment of the [South Carolina Trade Secrets Act] sought to expand trade secret protection and to implement other pro-business changes to the statute to make the state more attractive to businesses in the manufacturing and technology areas.").  South Carolina Code Section 39-8-40 (B) states that "[d]amages may include both the actual loss caused by misappropriation or the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.  In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret."  Thus, under South Carolina law, a reasonable royalty is recoverable as a damage remedy against

one who makes "unauthorized disclosure or use of a trade secret" and is recoverable "in lieu of" actual loss to the plaintiff.

A reasonable royalty focuses on the actual value of a trade secret to the misappropriator and asks what the royalty would have been if both parties were reasonably trying to reach an agreement on legally licensing the trade secret. *See, e.g.*, *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 537 (5th Cir. 1974). In looking at the issue of reasonable royalty, the cases suggest that the fact-finder should ask what royalty rate and terms would the plaintiff and defendant arrive at in an arms-length negotiation to license the plaintiff's trade secret(s). *See id.* at 539. "A reasonable royalty may be computed in various ways, including a lump-sum royalty based on expected sales or a running royalty based on a percentage of actual sales." *Secure Energy, Inc. v. Coal Synthetics, LLC*, 708 F. Supp.2d 923, 932 (E.D. Mo. 2010) (citing *Linkco, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 188 (S.D.N.Y. 2002)).

In calculating a reasonable royalty, "every case requires a flexible and imaginative approach," *University Computing Co.,* 504 F.2d at 538-39, but there are a number of factors a fact-finder may consider, including, among others: 1) "[t]he established profitability of the product made with the trade secret" and "its commercial success;" 2) "[t]he effect of selling the trade secret product in promoting sales of other products of the defendant;" 3) "[t]he extent to which the defendant has made use of the trade secret; and any evidence probative of the value of that use;" and 4) "[t]he portion of the realizable profit that should be credited to the invention as distinguished from no-trade secret elements, the manufacturing process, business risks, or significant features or improvements added by the defendant." *Secure Energy, Inc. v. Coal Synthetics, LLC*, 708 F. Supp.2d 923, 932 n. 4 (E.D. Mo. 2010) (citing *Linkco, Inc. v. Fujitsu Ltd.*,

232 F. Supp. 2d 182, 187 n. 7 (S.D.N.Y. 2002)); *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (listing fifteen factors the court may consider, which are commonly referred to as the "*Georgia-Pacific* factors."), *modified and aff'd*, 446 F.2d 295, 296 (2d Cir. 1971)).

At the Damages Hearing on December 17, 2014, Sonoco presented two witnesses to testify regarding Sonoco's reasonable royalty damages. Sonoco presented the testimony of Adam Wood, who is the Vice President of Sonoco Alcore Europe. Sonoco also presented the testimony of Brian Napper, an expert retained by Sonoco to offer an opinion as to Sonoco's reasonable royalty damages. Both Mr. Wood and Mr. Napper were qualified by the Court as experts under the Federal Rules of Evidence.

Mr. Wood offered testimony as to the trade secrets used in Sonoco's tubes and cores business, as well as testimony regarding the international tubes and cores market. He also offered credible expert testimony on the amount of estimated sales and revenues derived by Konfida, as well as estimated costs and margin derived by Konfida.[6] Mr. Wood, who was also admitted as an expert in the international tubes and

---

[6] Güven had the opportunity to provide information regarding Konfida's actual sales and expenses but refused to do so despite orders requiring him to produce such information. *See* ECF Nos. 80, 95. As set forth above, Güven also had notice of the hearing and the opportunity to cross-examine Sonoco's witnesses at the hearing, but Güven did not appear. Mr. Wood testified that the estimated revenue and sales data of Konfida was based on preexisting information and documents created by Sonoco in the ordinary course of business, not in documents created for this litigation. Mr. Napper testified that these types of documents are used by businesses and are appropriate to rely upon. Further, Mr. Wood testified that the data was audited and if there was any doubt as to whether a sale went to Konfida, that sale was not considered as a Konfida sale. The Court finds that the estimated sales and expense data, and Sonoco's use of such data in calculating the reasonable royalty is reasonable, appropriate, and in accordance with the law. *See, e.g., U.S.A. Famous Original Ray's Licensing Corp. v. Famous Ray's Pizza Buffet Inc.*, 2013 WL 5363777, at *5 (S.D.N.Y. Sept. 26, 2013) adopted, 2013 WL 5664058 (S.D.N.Y. Oct. 17, 2013) (finding the plaintiff's estimation of a trademark infringer's sales and method of calculating the infringer's profits "to be reasonable in light of [the defendant's] refusal to provide evidence to the contrary"); *Phat Fashions LLC v. Blue Max Corp.*, 2005 WL 1221838, at *2 (S.D.N.Y. May 2, 2005) ("In the absence of any information from

cores market, testified that it would take ten (10) years to acquire adequate information to establish a viable business in that market without using Sonoco's trade secrets.  Mr. Wood's testimony makes clear that the trade secrets have been accumulated over many years by Sonoco and that the use of these trade secrets gives Sonoco a competitive edge by allowing Sonoco to produce products with lower failure rates than its competitors.

Mr. Wood's testimony demonstrated the decreased volume and profitability of its products caused by Güven's misappropriation.  Mr. Wood further explained how Güven's misappropriation allowed Konfida to experience an unexpected and unusually swift speed to market by way of the head start created by using the proprietary information that Sonoco spent years developing.[7]  According to Mr. Wood, this head start has had a disruptive impact on the market that other competitors in Turkey have taken advantage of, to Sonoco's detriment.

Brian Napper offered testimony as to the amount of the reasonable royalty derived from the trade secret.  Mr. Napper is a highly qualified expert on issues relating to reasonable royalty damages.  Mr. Napper is a Senior Managing Director at FTI Consulting.  His background is in accounting, finance, and economics.  Mr. Napper has over 25 years of experience in the evaluation and quantification of damages arising from intellectual property disputes, including those involving trade secrets.  Mr. Napper

---

[the defendant] on costs, and because [the defendant] has not cooperated in discovery, the Court finds that these estimated sales are a fair indicator of profits").

[7] *See, e.g.*, *Uhlig v. Shirley*, C.A. No. 6:08-cv-01208-JMC, 2012 U.S. Dist. LEXIS 99387 (D.S.C. July 17, 2012)  (finding that the information at issue "was economically valuable because it represented a collective view of specific customer relationships that would allow someone to immediately compete for the customer's business without having to spend a significant amount of time researching the customer needs, preferences, and pricing tolerances"); *Sunbelt Rentals, Inc. v. Head and Engquist Equip., LLC*, 620 S.E.2d 222, 229 (N.C. App. 2005) (holding that the occurrence of the new company's significant profit and concurrent decrease in plaintiff's business "alone is circumstantial evidence of the defendants' use and disclosure of [plaintiff's] trade secret information").

has testified as an expert in numerous cases throughout the country on the terms of a reasonable royalty and the calculation of reasonable royalty damages, including high profile matters such as *Lucent v. Gateway*, *Uniloc v. Microsoft*, *Finisar v. DirecTV*, *3Com v. Realtek*, and *CSIRO v. Toshiba*.

Mr. Napper explained that the key determination is what Sonoco and Güven would have agreed is a reasonable payment or royalty specifically for the claimed Sonoco trade secrets in an arms-length negotiation. The *Georgia-Pacific* factors are designed to reach this determination. Mr. Napper considered all the *Georgia-Pacific* factors to calculate the reasonable royalty. Mr. Napper focused on the commercial relationship between the parties as competitors, the established profitability of the trade secrets by Sonoco and years of development that went into Sonoco's development of the trade secrets, the established policy and marketing program of Sonoco to maintain its control over the trade secret by not licensing others to use it, the lost sales and profitability that Sonoco has lost to Konfida as a result of the misappropriation, and the head start benefits that Güven and Konfida obtained through the use of the claimed trade secrets.

Based on Mr. Napper's analysis, Mr. Napper testified that, in an arms-length transaction between Sonoco and Güven, the reasonable royalty rate negotiated by them would be six percent (6%) of Konfida sales. Mr. Napper validated this percentage by considering the *Georgia Pacific* factors. When that rate is applied to estimated gross sales from 2010 through the end of 2013, the reasonable royalty amount for that time period is $1,991,146. Mr. Napper testified that this number was actually less than the head start advantage that was gained by Güven and his company, Konfida, of $2.1 million, thus corroborating the accuracy of his 6% reasonably royalty rate. Mr. Napper

19

also testified that, in his opinion, the reasonable royalty rate should extend through 2017.  Mr. Napper testified that the reasonable royalty damages from 2014 through 2017, discounting to present value damages from the hearing to 2017, are $2,800,892. Mr. Napper testified that the total reasonable royalty damages would therefore be $4,792,052.  Mr. Napper testified that the evidence considered and the method of calculation was appropriate to determine a reasonable royalty rate and the reasonable royalty damages for Sonoco to be assessed against Güven.  Mr. Napper testified that all of his opinions on reasonable royalty were held by him to a reasonable degree of certainty based on his experience and training.

The Court finds, based on the credible evidence in the record, that reasonable royalty damages on Sonoco's claim for misappropriation of trade secrets should be imposed against Güven in the amount of $4,792,052.00.

### 2.    Breach of Duty of Loyalty.

A plaintiff is entitled to collect all damages proximately resulting from the breach of duty of loyalty.  *See Lowndes Prods. Inc.*, 259 S.C. at 335, 191 S.E.2d at 768; *see also Moore v. Moore*, 599 S.E.2d 467, 473 (S.C. Ct. App. 2004).  The plaintiff also is entitled to a disgorgement of the profits that the wrongdoer received as a result of his disloyalty.  *See Rogers v. Salisbury Brick Corp.*, 299 S.C. 141, 144, 382 S.E.2d 915, 917 (1982); *see also United States v. Bowen*, 290 F.2d 40, 44 (5th Cir. 1961).  In addition, the South Carolina Supreme Court has indicated that an employer is entitled to recover wages paid to an employee during periods where the employee has been disloyal.  *See Futch v. McAlister Towing*, 335 S.C. 598, 612 n. 7, 518 S.E.2d 591, 598 n. 7 (1999) (citing *Chelsea Industries, Inc. v. Gaffney*, 449 N.E.2d 320, 326-28 (Mass. 1983) (indicating disloyal employee may be required to pay back compensation

received during periods of disloyalty); *Simulation Systems Technologies, Inc. v. Oldham*, 634 A.2d 1034, 1037 (N.J. Super. Ct. App. Div. 1993) (same); *Fidelity Fund, Inc. v. Di Santo*, 500 A.2d 431, 439-40 (Pa. Super. Ct. 1985) (same)).  "The general rule is that an employee is not entitled to any compensation for services performed during the period he engaged in activities constituting a breach of his duty of loyalty even though part of those services may have been properly performed."  *Futch*, 335 S.C. at 607-08, 518 S.E.2d at 596.  In particular, if the employee's "conduct constitutes a willful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned."  *Id.* at 608 n. 4, 518 S.E.2d at 596 n. 4.

Sonoco has requested reimbursement of the compensation that Sonoco paid Güven while he was acting in breach of his duty of loyalty.  Sonoco presented evidence at the hearing that Güven officially became half owner of Konfida on May 16, 2007. Sonoco's well-pleaded allegations, which are deemed admitted by Güven, establish that Konfida was secretly founded for the purposes of competing with Sonoco Turkey, and was formed using Sonoco's Protected Information.  Further, Güven used Sonoco's sales formulas, pricing strategies, customer lists, and business relationships in setting up and operating Konfida.  After forming Konfida, and while still employed by Sonoco, Güven solicited employees of Sonoco Turkey.  All of this conduct was willful. Consequently, the Court finds that Güven willfully breached his duty of loyalty to Sonoco starting in May 2007, and, therefore, Sonoco is entitled to reimbursement of the compensation it paid to Güven from May 16, 2007 through April 5, 2010.  Sonoco presented the testimony of Jimmy Shelley, the Manager of Base Compensation for Sonoco, who is in charge of handling all the compensation for Sonoco's expatriate

employees, such as Güven, and who presented the Court with the calculations of the compensation that Sonoco paid Güven during this time period. According to Mr. Shelley, this amounted to $611,548.51. The Court finds, based on credible evidence in the record, that Sonoco is entitled to $611,548.51 in damages on its claim for breach of Güven's duty of loyalty.

**B.    Exemplary Damages for Violation of the South Carolina Trade Secrets Act.**

South Carolina Code section 39-8-40 provides that "[u]pon a finding of wilful, wanton, or reckless disregard of the plaintiff's rights, the court may award separate exemplary damages in an amount not exceeding twice any award" of actual damages. S.C. Code § 39-8-40. The Court finds that Sonoco is entitled to an award of exemplary damages pursuant to South Carolina Code Section 39-8-40 in an amount of twice the reasonable royalty. As stated above, the Court accepts Sonoco's well-pleaded allegations as true, including its allegation that Güven's misappropriation was "willful." *See* Complaint at ¶69; *RBC Bank (USA) v. Epps*, No.: 4:11-cv-00124-RBH, 2013 U.S. Dist. LEXIS 966, at *4 (D.S.C. Jan. 2, 2013) (awarding treble damages pursuant to S.C. Code Ann. § 39-5-140 where "[b]y virtue of the entry of default, the allegations of the Plaintiff's well-pleaded Complaint are deemed admitted, including the allegations that the Defendants' violations were willful."); *see also Adriana Intern. Corp.,* 913 F.2d at 1414-15 (affirming the district court's award of punitive damages following entry of a default judgment).

The well-pleaded allegations of the Complaint, which, under federal law, the Court must accept as true, further establish that, prior to his employment with Sonoco, Güven had no experience or knowledge of the industrial products business. As an employee of Sonoco, Sonoco entrusted Güven with "a high level of management

autonomy and information." While employed by Sonoco, Güven used Sonoco's protected trade secrets and proprietary information, as well as its resources and supplies, to secretly form and operate Konfida in direct competition with Sonoco. Konfida manufactures its products using the same formulas, designs, machines, equipment and supplies as Sonoco Turkey. Konfida's manufacturing operations are virtually identical to that of Sonoco Turkey. The manufacturing processes and formulas used by Sonoco Turkey are part of Sonoco's Protected Information. Moreover, prior to leaving Sonoco, Güven collected tangible information relating to Sonoco's customers to use at Konfida, including product specifications and pricing lists, which are part of Sonoco's Protected Information. In addition, Güven engaged in bad faith during the litigation by disobeying the Court's orders and refusing to produce information regarding Konfida. *See* ECF. No. 124. This is a clear case of a willful and wanton disregard of Sonoco's rights.

Consequently, the Court finds that Sonoco is entitled to an award of exemplary damages in the amount of $9,584,076, which represents two times Sonoco's actual damages for its misappropriation of trade secrets claim (*see* Damages Hearing Exhibit 3).

### C.    Attorneys' Fees Under the South Carolina Trade Secrets Act.

A successful trade secrets plaintiff is entitled to an award of reasonable attorneys' fees if a "willful misappropriation exists." S.C. Code Ann. § 39-8-80 ("If . . . wilful misappropriation exists, the court may award reasonable attorney's fees to the prevailing party."). The Court finds that Sonoco is entitled to an award of reasonable attorneys' fees pursuant to South Carolina Code Section 39-8-80. Sonoco is the "prevailing party" in this litigation. Further, as stated above, the Court accepts Sonoco's

well-pleaded allegations as true, including its allegation that Güven's misappropriation was "willful."  *See* Complaint at ¶69; *Epps*, 2013 U.S. Dist. LEXIS 966, at *4.

Sonoco seeks attorneys' fees in the amount of $573,785.28 in this action.[8]  The Court's determination of the reasonableness of a fee award begins with the Court's calculation of the lodestar figure, which "is calculated by multiplying a reasonable hourly rate by the reasonable time expended."  *Layman v. State*, 376 S.C. 434, 458, 658 S.E.2d 320, 332-33 (2008) (citing *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 652 (4th Cir. 2002)); *see also Liberty Mut. Ins. Co. v. Emp. Res. Mgmt., Inc.*, 176 F.Supp.2d 510, 532 (D.S.C. 2001).  "Using this [lodestar figure] as a starting point for reasonableness, a court may consider other factors justifying an enhancement of the lodestar figure with a 'multiplier' before arriving at a final amount."  *Layman*, 376 S.C. at 458, 658 S.E.2d at 332-33 (citing *Edmonds v. United States*, 658 F.Supp. 1126, 1148 (D.S.C. 1987)).

The Fourth Circuit has adopted a twelve-factor test for making a lodestar determination:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorney's fees awards in similar cases.

*Emp. Res. Mgmt., Inc.*, 176 F.Supp.2d at 532.  There is no strict manner in which these

---

[8] This amount includes the fees of $39,896.02 related solely to Sonoco pursuing sanctions against the Defendant for his failure to comply with the discovery orders of this Court.  It also includes the application of a 15% long-term client discount specific to Sonoco.

twelve factors are to be considered and applied.  *See id.* at 532.  "Likewise, a district court is under no obligation to go through the inquiry of those factors that do not fit the circumstances of the particular case for which fees are sought."  *Id.*  The Court applies these factors as follows:

### 1.    Time and labor expended.

Sonoco has submitted the affidavit of Mr. William C. Boyd from Haynsworth Sinkler Boyd (ECF No. 133-1), which has acted as Sonoco's counsel in this matter. According to Mr. Boyd's Affidavit, Sonoco's attorneys have expended 2,255.1 hours of attorney and paralegal time in connection with this matter.  Sonoco's attorneys began representation in July 2010 and this lawsuit was commenced on June 20, 2011. Sonoco was required to respond to a motion to dismiss on the grounds of forum non-conveniens, as well as challenges as to the subject matter jurisdiction of the Court, and the appropriateness of maintaining this litigation in this Court.  Sonoco was successful in defeating those challenges.

In addition, this case involved lengthy disputes over the Defendant's discovery responses and obligations, including many failed attempts to voluntarily resolve those disputes.  Sonoco pursued discovery from Güven for over a year and a half before Güven ultimately refused to produce the information despite the Court's orders.  As part of Sonoco's pursuit, after several letters and efforts to obtain the information, Sonoco filed and briefed its motion to compel and reply in support thereof, as well as its opposition to Güven's motion for reconsideration of the Court's order granting the motion to compel.  In addition, Sonoco filed and briefed two motions for sanctions when Güven refused to produce the information Sonoco sought.

### 2.    The novelty and difficulty of the questions raised.

This case involved trade secrets of a highly technical nature.  It also involved complicated legal and procedural questions involving a Turkish National and analysis of the law of Turkey.

### 3.    The skill required to properly perform the legal services rendered.

The highly technical trade secrets and international procedural issues in this case require a high degree of skill and knowledge.

### 4.    The attorney's opportunity costs in pressing the instant litigation.

As noted above, Sonoco's counsel has documented over 2,255.1 hours of attorney and paralegal time in connection with this matter.  Such a time commitment represents a significant opportunity cost in terms of other cases that could have been handled during the same period.

### 5.    The customary fee for like work.

The Affidavit of Mr. Boyd states that the litigation team on this matter includes shareholders H. Sam Mabry, III; J.W. Matthews, III, and John M. Florence, Jr.  Mr. Mabry's billing rate is $400 per hour, Mr. Matthews' billing rate is $310 per hour, and Mr. Florence's rate is $325 per hour.  Mr. Boyd's rate is $475 per hour.  According to Mr. Boyd's Affidavit, Associate Attorneys and paralegals were relied upon heavily to help lessen the costs to Sonoco.  The Associates were billed between $155 and $250 per hour, and paralegals were billed between $160 and $180 per hour.  *See* ECF No. 133-1 ¶¶10-14.  The Court notes that a 15% discount was applied.

Mr. Boyd's Affidavit attaches portions of *The Survey of Law Firm Economics* conducted and published by Incisive Legal Group for 2011, 2012 and 2013, and

compares the South Carolina rates in *The Survey of Law Firm Economics* to the rates charged in this matter. The comparison reveals that the hours charged in litigating this matter are lower than the 9th Decile rate listed in *The Survey of Law Firm Economics* for the years 2011, 2012 and 2013. *See* ECF No. 133-1 ¶¶18-20.

The Court finds that the rates charged to Sonoco in this matter are fair and reasonable for like work. *See also Layman*, 376 S.C. at 460, 658 S.E.2d at 334 (approving rates of $500-$600); *Savani v. Taylor*, C.A. No.: 1:06-cv-02805-JMC, 2014 U.S. Dist. LEXIS 5092 (D.S.C. Jan. 15, 2014) (quoting the declaration of Professor John Freeman that the customary rate for services by experienced counsel is in the range of $500-$650 per hour in an ERISA case); *Palmetto Health Credit Union v. Open Solutions Inc.*, C.A. No. 3:08-cv-3848-CMC, 2011 U.S. Dist. LEXIS 692, at *17 (D.S.C. Jan. 4, 2011) (approving rate of $385 for partner).

### 6.    The attorney's expectations at the outset of the litigation.

The Court finds that this factor does not affect the attorney's fee in this case.

### 7.    The time limitations imposed by the client or circumstances.

The Court finds that this factor does not affect the attorney's fee in this case.

### 8.    The amount in controversy and the results obtained.

As indicated above, Sonoco sought, and recovered, actual damages of $5,403,600.61, including $4,792,052 for the Misappropriation of Trade Secrets claim.[9]

---

[9] Furthermore, the Court finds that the claim for misappropriation of trade secrets is interrelated with the claims for breach of fiduciary duty and breach of contract such that the work on the trade secrets claim cannot be separated out. See *Uhlig, LLC v. Shirley*, 895 F. Supp. 2d 707, 711 n. 3 (D.S.C. 2012) (finding that attorneys' fees awarded under claim for misappropriation of trade secrets were interrelated with claims for breach of fiduciary duty and breach of contract); *see also Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983).

### 9.    The experience, reputation and ability of the attorney.

The Affidavit of William C. Boyd establishes that Sonoco's litigation team is composed of highly experienced, reputable, and able attorneys.  *See* ECF No. 133-1 ¶¶10-13.  The Court finds that the hours spent on this case by Sonoco's attorneys are commensurate and reasonable in light of their respective levels of experience as compared to those that would have been spent by other attorneys of comparable experience.

### 10.    The undesirability of the case.

While this was a complex case, it was not per se undesirable.  Thus, this factor will be deemed a neutral factor that will not affect the award of fees in this case.

### 11.    The nature and length of the professional relationship between attorney and client.

The Affidavit of Mr. Boyd establishes that he and his firm have a longstanding relationship with Sonoco.  Based on that relationship, Sonoco has already imposed a 15% discount on its fees.  The Court finds that this longstanding relationship does not warrant a downward adjustment, and, even it if did, the discount more than satisfies any such adjustment.  If anything, the fact that Sonoco has previously paid these rates weighs in favor of a finding that the fees are reasonable.  *See Employee Res. Mgmt., Inc.*, 176 F.Supp.2d at 538 ("when an attorney has performed work for a client in the past, and the client has previously paid the same customary rates charged by the attorney, that evidence weighs in favor of a finding that the fees sought are reasonable.").

### 12.    Attorney's fees awards in similar cases.

The Court finds that the requested fee award is in line with fee awards in similar cases.  *See Super Duper, Inc. v. Mattel, Inc.*, C.A. No. 6:05-cv-1700-HFF-WMC, 2009

WL 866463 (D.S.C. Mar. 31, 2009) (finding a request for fees in the amount of $2,643,844.15 appropriate in a complex trademark and patent infringement case litigated over more than three years and involving experienced in-state and out-of-state counsel); *GTR Rental, LLC v. DalCanton*, 547 F. Supp. 2d 510, 524 (D.S.C. 2008) (awarding fees of $550,000 in case involving claims of breach of fiduciary duty, fraud, conversion, misappropriation of trade secrets, and unfair trade practices); *Palmetto Health Credit Union*, 2011 U.S. Dist. LEXIS 692, at *17 (awarding attorney's fees of $748,703.38 in case involving claims of breach of contract, fraud, and unfair trade practices).

Applying these factors, the Court finds that an award of attorney's fees in the amount of $573,785.28 is reasonable.  The Court notes that this is the amount billed and actually paid by Sonoco with the 15% discount given to Sonoco.  The Court is not using a multiplier to increase the award of attorney's fees, which the Court would have discretion to do.

## CONCLUSION

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that judgment be entered in this action in favor of Plaintiff Sonoco Products Company against Defendant Levent Güven for:

1. the sum of $4,792,052.00 as actual damages for misappropriation of trade secrets;

2. the sum of $611,548.51 as actual damages for breach of the duty of loyalty;

3. the sum of $9,584,076.00 as exemplary damages for Güven's willful, wanton, or reckless misappropriation of Sonoco's trade secrets; and

4. the sum of $573,785.28 as attorneys' fees under section 39-8-80 of the South Carolina Trade Secrets Act.

**IT IS SO ORDERED.**

<u>/s/ Bruce Howe Hendricks</u>
United States District Judge

January 8, 2015
Greenville, South Carolina